Robert F. Brennan, Esq. [S.B. #132449]
LAW OFFICES OF ROBERT F. BRENNAN, A P.C.
2103 Montrose Ave., Suite D
La Crescenta, CA 91214
Tel. (818) 249-5291; Fax (818) 249-4329
Email: rbrennan@brennanlaw.com

Attorney for Plaintiff
MONIQUE HESSELBROCK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONIQUE HESSELBROCK, an Individual; <br><br> Plaintiff, <br><br> vs. <br><br> I.Q. DATA INTERNATIONAL, INC., is a business entity; EQUIFAX INFORMATION SERVICES, LLC., is a business entity; and DOES 1-25, Inclusive, <br><br> Defendants. | Case No.: 2:23-cv-02169 FLA (PVCx) <br> Hon. Fernando L. Aenlle-Rocha <br><br> **PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** <br><br> Courtroom: 6B, 350 W. 1st St. <br><br> Complaint Filed: 3/23/2023 <br> Pre-trial date: 10/4/24 <br> Trial Date: 10/22/2024 |

---

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I. <u>INTRODUCTION</u>

**Brief Summary of Plaintiff's Contentions**

Plaintiff Monique Hesselbrock has an M.B.A. degree and a perfect credit record, except for the IQ derogatory in issue here. She has confirmed unequivocally that she does not owe the debt, and the proof presented herein establishes that she is correct. IQ is being exceptionally misleading in insisting that she owes the debt.

IQ tries to emphasize the small amount of the debt, $81.54. But this is exactly the strategy of unscrupulous collection agencies—harass consumers to the point of paying a relatively small amount they do not owe. The amount of damages is significantly more than what Defendant represents. A "late" or "in collections" notation for a debt of $0.01 can drop a consumer's credit score, and creditworthiness, by dozens, even hundreds, of points, and can remain on a consumer's credit report for up to seven years. Plaintiff seeks a substantial sum for damage to her reputation and for her emotional distress as the result of IQ's unscrupulous tactics to get her to pay a debt she does not owe. Plaintiff also seeks punitive damages for IQ's willful violations of both the federal and California credit reporting statutes.

## II. <u>STATEMENT OF FACTS</u>

On February 24, 2018, Plaintiff entered into a lease for an apartment in Northville, Michigan. This included a $99 security deposit. (Docket #18, First Amended Complaint ("FAC") ¶ 8.) The apartment complex is known as Park Place, and the landlord was JRK Residential Group ("JRK" or "landlord").

On July 13, 2021, a man attempted to break into Plaintiff's apartment while she was in the unit. Plaintiff called 911, and the police detained the man (who was unknown to her). Plaintiff notified the apartment management of the incident. Plaintiff went to stay with a friend because she did not feel safe living alone in her apartment after that incident. Plaintiff also filed a police report.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

On July 15, 2021, the Area Manager, Ruth Cook, responded to Plaintiff's email, offering her the option of either transferring to another apartment or terminating her lease without penalty. On July 18, 2021, Plaintiff responded to Ms. Cook, agreeing to the second option—terminating her lease without penalty. Plaintiff stated that she would vacate the apartment completely by the end of the month (July 31, 2021) or sooner.

On July 30, 2021, Plaintiff completely vacated the apartment. Plaintiff returned the keys and signed the key return acknowledgment form. The form included all of Plaintiff's contact information: cell phone number, email address, and mailing address for the landlord to contact her if needed. This form was signed by both Plaintiff and the Assistant Manager "Chloe. Plaintiff emailed Ms. Cook, confirming the same.

On July 30, 2021, Ms. Cook acknowledged by email and said Plaintiff should reach out to her with any questions. Plaintiff moved to Ohio from August through October 2021.

On August 24, 2021, Plaintiff received a letter from Defendant IQ stating that she owed an outstanding balance of $81.54 on the apartment vacated almost a month earlier. There was no explanation of the alleged charge, and no authenticating documentation was attached to the letter. The same day, Plaintiff emailed the apartment personnel about the alleged charge. She received no response.

That same day, Plaintiff was able to log into the Park Place apartment portal where all bills, maintenance requests, communications, etc., are posted. The portal showed, as of August 2021, that Plaintiff had a $0.00 balance. Plaintiff took a screenshot of the portal showing the $0.00 balance.

On August 30, 2021, Plaintiff emailed the apartment management a second time regarding the charge. She sent the email to five email addresses she found related to Park Place (e.g., manager and assistant manager email addresses), asking for a response. She received no response.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

On September 7, 2021, Plaintiff received a second letter from IQ asking for payment. Again, there was no indication of the nature of the alleged charge and no authenticating documentation attached to the letter. On the same day, Plaintiff emailed the apartment management a third time regarding the charge. Plaintiff also included the company that owns Park Place apartments, JRK. There was no response from anyone on this thread either.

On September 14, 2021, Plaintiff received a third letter from IQ asking for payment. Again, there was no indication of the nature of the alleged charge and no authenticating documentation attached to the letter. This was the third letter in less than one month from IQ. On the same day, Plaintiff logged into the apartment portal. The portal showed that, as of September 2021, Plaintiff had a $0.00 balance. Plaintiff took a screenshot of the September 2021 portal showing a $0.00 balance.

On September 22, 2021, Plaintiff prepared and sent a letter to Park Place disputing the charge. Plaintiff's September 22, 2021 letter to the Park Place Leasing Office states in part (bold added): **"When I received a third letter from I.Q. Data International on September 21st, I reached out to your leasing office at Park Place at Northville yet again, and got through to a representative on the phone. She confirmed that there was a $0 balance on my account. I checked the Northville residential portal online yet again on September 22nd and it showed a $0 balance."** She also wrote a letter to IQ disputing the charge and included a copy of the letter she sent to Park Place management. Both companies received mailed copies of her dispute. While the Park Place representative confirmed by phone that she owed nothing, as quoted above, Plaintiff never heard back from either Park Place or IQ in writing. *IQ never sent Plaintiff any validation of the alleged debt.*

On October 16, 2021, Plaintiff got married, changed her surname, and moved. Having heard nothing after her September 22, 2021 letter, she thought the matter had been resolved. **About a year later and with no notice,** on September 8, 2022, Plaintiff received a notification from Experian about an alert on her credit file. When

3

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

she checked the Experian portal, she found that IQ had flagged her account for collections. The date listed for the charge was July 30, 2021, the date she vacated the apartment and returned the keys to Park Place. On the credit reports, the amount is listed as a charge disputed by the customer, proving that IQ received her initial letter a year earlier. There was never any communication or a validation letter from IQ, Park Place or anyone describing the charge.

On September 13, 2022, Plaintiff obtained copies of her credit report from all three credit bureaus – Experian, TransUnion, and Equifax. Plaintiff prepared dispute letters to all three agencies and included proof that she did not owe the charge. Plaintiff also sent a copy of this dispute package to IQ. Plaintiff received signed return receipts from all three credit bureaus and IQ. **Within ten days, both Experian and TransUnion had deleted the derogatory from her credit report.**

On September 26, 2022, Equifax asked for proof of her identification and proof of residence and for her to resubmit the dispute request. Equifax had sent this letter to her previous address in Ohio. Plaintiff did not receive the letter until November 2022. On December 3, 2022, as requested, Plaintiff mailed her identification information to Equifax along with, for a second time, the dispute package. On December 7, 2022, Plaintiff received confirmation that Equifax had received her documentation.

On December 5, 2022, Plaintiff sought the help of the Consumer Financial Protection Bureau, mailing them all supporting proof.

On December 12, 2022, Plaintiff received a letter from IQ, dated November 30, 2022, requesting the police report, a notarized affidavit or signed statement about the issue, a valid government ID, and proof of residency in her name at the time the event occurred. The letter still did not mention the nature of the alleged charge. Plaintiff sent correspondence to Equifax, IQ, and Park Place management multiple times, asking that they reinvestigate her account, cease any negative credit reporting, and remove her account from collection activity. Plaintiff's correspondence to the

4

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

defendants included her police report and an affidavit Plaintiff filed with the Federal Trade Commission.

*To this day, IQ continues to credit-report the alleged debt to Plaintiff's Equifax credit report as a collections account—a serious derogatory credit mark.*

Plaintiff suffered emotional distress damages as the result of IQ's conduct.

Plaintiff alleges three causes of action in her First Amended Complaint: (1) violation of the federal Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.); (2) violation of the California Rosenthal Fair Debt Collection Practices Act (Civil Code § 1788 et seq.) and the federal Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.); and (3) violation of the California Consumer Credit Reporting Agencies Act (Civil Code § 1785.1 et seq.).

### III. <u>MEMORANDUM OF APPLICABLE LAW</u>

### A. <u>DEFENDANT'S ENTIRE DEFENSE FAILS BECAUSE PLAINTIFF WAS NEVER PROVIDED ANY NOTICE OF A BALANCE DUE WITHIN THE TIME REQUIRED BY MICHIGAN LAW.</u>

Defendant's defense fails because Plaintiff was not provided a notice of the obligation due within 30 days of her moving out, as required by the Michigan Landlord-Tenant Act. Since the property is located in Michigan, the Act applies. IQ's document production references the Michigan Landlord-Tenant Act.

The Michigan Landlord-Tenant Act requires that in the case of any damages or obligation against the security deposit, the landlord must mail an itemized list to the tenant within 30 days after termination of occupancy. The notice must include the following statement on the notice: "You must respond to this notice by mail within 7 days after receipt of same, otherwise you will forfeit the amount claimed for damages." Michigan Landlord-Tenant Act, Act 348 of 1972, Eff. Apr. 1, 1973, 554.609, Sec. 9.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

The Act also provides that the failure of the landlord to comply with the notice requirement within 30 days after the termination of occupancy constitutes agreement by the landlord that no damages are due and the full security deposit must be remitted to the tenant. *Id*., 554.610, Sec. 10.

In simple terms, the alleged debt is entirely invalid by operation of Michigan law. This bolsters not only the Fair Credit cause of action but also the Fair Debt Collection cause of action.

**1. IQ is Estopped from Claiming Ignorance of the Michigan Landlord-Tenant Act Because IQ Cited a Provision of the Act in Its Debt Collection Correspondence to Plaintiff.**

IQ may argue that Plaintiff cannot raise the Michigan Landlord-Tenant Act because it is not specifically alleged in Plaintiff's Complaint. Plaintiff's Complaint alleges that there is no legal or factual basis for the debt (Docket #18, FAC ¶ 44) and also alleges that the credit reporting of the alleged debt is false, erroneous and inaccurate.

More important on this point, *IQ's discovery responses and documents raised the issue of the Michigan Landlord-Tenant Act.* Exhibits 12 and 15 to plaintiff's summary judgment opposition are copies of IQ's "Security Deposit Statement"— Exhibit 12 includes interlineated comments from Plaintiff, and Exhibit 15 is a clean copy. The bottom of this document has the following statement in bold letters and enlarged font:

**Security Deposit Law, Act 348 of the Public Acts of 1972, states in Section 9: "You must respond to the notice by mail within 7 days after receipt, otherwise you will forfeit the amount claimed for damages."**

IQ cannot now claim that Plaintiff's Complaint failed to give IQ notice of the Act, *since IQ itself gave notice of the Act to Plaintiff.* This reference in IQ's own document to the Michigan Landlord-Tenant Act (actual title, "Landlord and Tenant

Relationships Act 348 of 1972) was a factor in prompting Plaintiff's counsel to research the Act. Plaintiff's counsel discovered Section 10, cited above, which invalidates any landlord claim for "damages or obligation against the security deposit" unless the landlord mails the former tenant an itemized list within 30 days after termination of the tenancy.

**2. IQ Never Provided Plaintiff with Any Statement of Security Deposit Account, and Never Provided Any Explanation of the Alleged Debt Until Nearly Two Years After Plaintiff Moved Out, and After This Lawsuit Was Filed.**

Plaintiff confirms in her declaration that she never received any accounting of her security deposit, either from IQ or from her former landlord JRK. Plaintiff and her counsel first received this Statement of Security Deposit in discovery responses from IQ, after the lawsuit was filed. Defendant has offered no evidence that the Statement of Security Deposit Accounts was provided to Plaintiff within 30 days of moving out.

Plaintiff's several dispute letters to her former landlord and to IQ, written mostly between September and November of 2021, never mention the Statement of Security Deposit. This corroborates Plaintiff's statement of never having received this document before IQ's discovery responses.

**3. The Fair Debt Collection Practices Act Cause of Action in Plaintiff's Complaint Requires that IQ Only Debt-Collect on Legally Valid Debts.**

In addition to its FCRA reinvestigation obligations, discussed at length below, IQ is legally obligated to only debt-collect on legally valid debts. Paragraph 44 of Plaintiff's First Amended Complaint (Dkt. #18) alleges that IQ violated the federal and California Fair Debt Collections Practices Acts by "attempting to collect on a debt with no legal or contractual basis for doing so and by failing or refusing to

validate the debt in spite of repeated requests to do so." Such conduct explicitly violates 15 U.S.C. § 1692e(6) and 15 U.S.C. § 1692f(1).

### C. THE ISSUE OF NONCOMPLIANCE WITH THE MICHIGAN LANDLORD-TENANT LAW IS SQUARELY BEFORE THIS COURT.

IQ may argue that the issue of the Michigan Landlord-Tenant law is not before the court because it is not expressly pleaded in Plaintiff's Complaint.  IQ's argument fails quickly and decisively with the mandate of Fed. R. Civ. P. 8, which requires only a "short and plain statement of the claim." There is no requirement to plead each and every basis of why IQ violated both credit reporting and debt collection laws. *Ghebreselassie v. Coleman Sec. Service*, 829 F.2d 892, 895 (9th Cir. 1987), cert. denied, 487 U.S. 1234, 108 S. Ct. 2900, 101 L. Ed. 2d 933 (1988) (properly pleaded claim in federal court need not specify under which law it arises, since complaint need only set forth a short and plain statement of the claim showing that pleader is entitled to relief).

**The Issue of IQ's Non-Compliance With the Michigan Landlord-Tenant Act Is Not a "Purely Legal" Issue And Should Have Been a Part of Any Reasonable Reinvestigation.**

Plaintiff anticipates that IQ might argue that IQ's non-compliance with the Michigan Landlord-Tenant Act is a "purely legal" question and thus IQ is excused from including it in its reinvestigations of Plaintiff's disputes. As discussed above, IQ put the Michigan Landlord-Tenant Act at issue in this case by citing a portion of it in its debt collection letters to Plaintiff.

The requirement at issue, found in Section 9 of the Michigan Act, requires a landlord to send out a statement of charges against a tenant's security deposit within 30 days. If the landlord fails to send out the notice within the 30-day period, all

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

charges are extinguished, and the landlord must refund in full the tenant's security deposit.

This requirement is hardly a "legal issue." The law is meant for non-lawyer tenants to have notice of charges against their security deposits. A coupon for a free topping on a pizza that includes a notice that it must be redeemed within 30 days is not a "legal issue."  If a customer shows up a year later (as IQ did) and tries to redeem the coupon, the pizza restaurant will refuse. A requirement to send out a statement of charges against a tenant's security deposit within 30 days does not create a "legal issue" which excuses IQ's obligation to reinvestigate Ms. Hesselbrock's disputes.[1]

**Ninth Circuit Law Does Not Excuse IQ From Investigating Whether the Alleged Debt Had Extinguished by Operation of the Michigan Landlord-Tenant Act.**

Particularly since IQ cited the Michigan Landlord-Tenant Act in its correspondence, IQ assumed the responsibility of verifying whether the alleged debt was valid under this Act when doing its investigation. Here, even though IQ cited the Michigan Landlord-Tenant Act in its Statement of Security Deposit, there is no evidence that anyone from IQ ever inquired whether the alleged debt was valid under that very Act. Given IQ's self-inflicted familiarity with the Michigan Act, inquiry into whether the alleged debt had expired under that Act should have been a part of any reasonable investigation. It would set very bad precedent if debt collectors were allowed to ignore the obvious requirement of verifying if a Statement of Security Deposit was sent within the specified time limit.

---

[1] The "legal vs. factual" distinction has not been recognized for furnishers of credit information in the Ninth Circuit.  If after reading IQ's reply brief the court wishes a briefing on this issue, plaintiff would be happy to provide the court with a brief on this.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## D. <u>IQ'S INVESTIGATION WAS PERFUNCTORY AND NOT REASONABLE.</u>

Beyond IQ's failure to investigate the Michigan Landlord-Tenant Act, IQ's investigation was unreasonable and perfunctory. The law requires IQ to conduct a *reasonable* investigation of its credit reporting upon receiving a notice of dispute from a credit bureau. What constitutes a "reasonable" investigation is case specific, and the investigation must be "reasonable under the circumstances. It may be either simple or complex, depending on the nature of the dispute." Fed. Trade. Comm'n, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations (2011), at p. 96, referencing Section 623(b), ¶ 2.[2] A merely "superficial" inquiry will not suffice; a reasonable investigation "requires some degree of careful inquiry." *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 431 (4th Cir. 2004); *Hinkle*, 827 F.3d at 1303. It must contain a "qualitative component," *Johnson*, 357 F.3d at 430, and courts reject furnishers' attempts to claim that they can meet their obligation to investigate simply because they have gone through the motions of conducting an investigation. *See, e.g., Alston v. Wells Fargo Bank, N.A.*, No. 8:12-cv-03671-AW, 2013 WL 990416, at *5 (D. Md. Mar. 12, 2013).

In this case, IQ's so-called investigation boils down to receiving documents from JRK, the landlord, *over one year after Plaintiff initially disputed,* and concluding that the documents support the derogatory credit reporting *which IQ began before receiving the documents*.  IQ then failed to follow up with JRK to clarify discrepancies in these documents.

There are many reasons why IQ's reinvestigation was not reasonable:

---

[2] https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf

10

1. Plaintiff corresponded with both IQ and JRK in September of 2021.  Ms. Hesselbrock provided IQ with the screenshots of the JRK portal, showing the zero balance. She also asked for specifics about the alleged charges. She reiterated that she had spoken with Ruth Cook, the on-site manager at her apartment complex, who had indicated to her that she had a -zero- balance on move-out.  She then followed up with a phone call to her apartment complex and once again confirmed that she had a -zero- balance and did not owe anything.

2. On October 15, 2021, IQ contacted JRK in response to the several disputes from Ms. Hesselbrock. IQ reached out to JRK for documents to support the alleged debt.

3. *Nearly a year later,* on July 14, 2022, IQ commences its false credit reporting.  *Per IQ's own internal notes, IQ had not received any documents supporting the existence or amount of the debt when it commenced its false credit reporting.  There is no record of IQ receiving any documents from the landlord, JRK, between the time when IQ asked for them—October 15, 2021—and when IQ began the false credit reporting.* IQ in fact did not receive documents from the landlord until August 31, 2022.

4. IQ's total investigation of Ms. Hesselbrock's disputes consisted of two emails to the landlord, and nothing more. The first was sent on October 15, 2021, and the landlord did not respond to this email. The second, sent nearly a year later on August 30, 2022, elicited a response with no comment, and no description, from the landlord, with six documents (abbreviated document descriptions in the "Attachments" section of the reply email from "Chloe"): Plaintiff's application, the lease, two pictures of the carpet, the "ledger" and the "SODA" document. (The "SODA"

11

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

document refers to "Statement of Security Deposit Account".) *This was the sum total of IQ's so-called reinvestigation.*

5. The ledger produced by IQ in discovery in fact shows a -zero- balance. IQ argues, without competent evidence, that the landlord JRK wrote off the balance allegedly owing of $81.54 when it transferred the account to IQ for debt collection, but IQ fails to provide a declaration from a witness with personal knowledge from the landlord, JRK, to support this.

6. *The ledger itself supports the fact of a -zero- balance and confirms the balance reflected in the online portal.* The date and time on the ledger appear in the upper left-hand corner: August 31, 2022, 2:21 p.m. JRK is located in Michigan, which is in Eastern Standard Time; IQ is located in Bothell, Washington, which is in Pacific Standard Time. Thus, August 31, 2022 at 2:21 p.m. in Michigan is 11:21 in Bothell, Washington. "Chloe" sent the documents to Warren Fast Buffalo Horse, which his email identified as arriving at 11:36 a.m. In other words, "Chloe" sent the ledger to Warren Fast Buffalo Horse 15 minutes after she retrieved it.

7. "Chloe" provided no explanation for the -zero- balance. Per IQ's collection notes, IQ received this document on August 31, 2022. Thereafter, in IQ's collection notes, *there are no entries whatsoever showing that anyone from IQ sought to clarify the -zero- balance on the ledger and the $81.54 balance on the Statement of Security Deposit Account.*

8. In other words, IQ's investigation was positively not reasonable—IQ had a clear discrepancy in the account documents from its client and never bothered to clarify the discrepancy. Yet, IQ continued its false credit reporting.

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

9. Plaintiff provided IQ with two screenshots of the online portal, which was the mechanism that the landlord, JRK, used to notify its tenants of balances due. Both screenshots show a "0" balance, one in August of 2021, one in September 2021. Plaintiff, ever diligent, followed up with a phone call to JRK, where a representative confirmed that she had a -zero-balance.

10. IQ's argument that the online portal was not accurate is utterly unsupported with evidence. IQ's empty assertion of "common knowledge" does not come close to qualifying as a matter that can be judicially noticed. Fed Rules Evid 201.

11. The documents provided by the landlord *did not* show the balance in the online portal.  The documents provided by the landlord *did not* show whether the balance in the online portal had been set at a -zero- balance when Plaintiff moved out. (The landlord, JRK, likely was concerned that Ms. Hesselbrock would sue the landlord for bad security at the apartment—JRK had a strong incentive to part ways with her peacefully.)

12. As part of its investigation, IQ *did not* contact Ruth Cook or obtain information from her. Ms. Cook is the person who indicated to Ms. Hesselbrock that she could move out without a remaining balance. Ms. Hesselbrock specifically identified Ruth Cook when she provided IQ with her email exchanges with Ms. Cook.

In sum, Plaintiff provided IQ with *ample evidence* that she had moved out with a -zero- balance, and IQ's ledger confirmed this.  At the very least, for purposes of framing an investigation, IQ had a *clear discrepancy* in the documents it received from JRK—the Statement of Security Deposit showed a balance of $81.54, while the ledger showed a -zero- balance. IQ's investigation was positively unreasonable for not investigating whether JRK, the landlord through its managers (particularly Ruth

13

Cook) had zeroed out her account, perhaps to avoid liability, perhaps as an apology for poor security at the apartment.

Ms. Hesselbrock provided IQ with documentary evidence from the online portal that her balance was -zero-.  That, alone, should have been enough to inform IQ that the alleged debt *cannot be verified*, and thus illegal for credit reporting. 15 U.S.C. 1681s-2(b)(1)(E) (furnisher to block or delete credit reporting "(i)f an item of information disputed by a consumer is found to be inaccurate or incomplete or *cannot be verified* after any reinvestigation…").

**E. <u>PLAINTIFF PAID HER RENT AND UTILITIES AT THE BEGINNING OF EACH MONTH AND HAD PAID HER RENT AND UTILITIES IN FULL ON JULY 1, 2021.  SHE PAID HER LANDLORD AN AMOUNT, DETERMINED BY THE LANDLORD, TO COVER HER UTILITIES FOR THE COMING MONTH. SHE WAS PAID IN FULL FOR THE MONTH OF JULY 2021, WHEN SHE MOVED OUT.  Fact Nos. 62-63.</u>**

IQ's case rests on the notion that Plaintiff left her apartment with a balance owing for her utilities. This was not how Plaintiff's lease worked with her former landlord. She was expressly instructed by Park Place to "just pay what is on the portal," referring to Park Place's payment portal where all bills, maintenance requests, communications, etc. are posted. Accordingly, that is exactly what she did for the next two and one-half years without incident, up to the time she vacated her apartment on July 30, 2021. She paid a sum to the landlord at the beginning of each month to cover her utilities for the coming month. For the utilities which were a part of her monthly rent, she had no separate contract with these utilities. The landlord calculated a sum to cover her utilities and added it to her rent at the beginning of each month. She does not know how the landlord performed this calculation.

There were three utilities not covered by her rent: electric, gas and internet. She paid these three directly to the service providers. DTE Energy provided electricity,

and she paid $18.82 on July 30, 2021 to be paid up with her account before closing it. Consumer Energy provided gas and she had a credit of $111.96 when she left the apartment. AT&T provided internet service and she had a credit of $3.38 when she left the apartment.

When Plaintiff moved out at the end of July, 2021, she had already paid in full for the month of July, 2021. As confirmed by the landlord's online portal, which she checked twice after she moved out, her balance owing to the landlord was $0.00.

## F. <u>IQ VIOLATED THE FEDERAL AND CALIFORNIA FAIR DEBT COLLECTIONS STATUTES WHEN IT FAILED TO VALIDATE THE DEBT WITHIN 30 DAYS AFTER PLAINTIFF DISPUTED IT. Fact 64.</u>

15 U.S.C. Section 1692g(b) requires a debt collector to validate a debt if the consumer disputes its validity within 30 days after the debt collector gives the consumer written notification of the alleged debt. As seen in the timeline and in exhibits 3, 5, 7 and 14, Plaintiff clearly and repeatedly disputed this debt with both IQ and with her former landlord within the 30-day period. IQ continued its collection activities, including derogatory credit reporting, without validating the debt. The first and only time that IQ made any effort to validate the debt was when it sent the Security Deposit Statement to Plaintiff's counsel in discovery responses in late 2023 and early 2024. IQ's continuing debt collection activities without validating the debt constitutes a violation of both the federal and state Fair Debt Collection statutes. Plaintiff has alleged IQ's failure to validate the debt in paragraph 44 of her First Amended Complaint.

## G. <u>PLAINTIFF SUFFERED DAMAGES.</u>

### 1. Plaintiff Suffered Emotional Distress Damages. Fact Nos. 84-93.

Emotional distress damages may be recovered under the statutes in issue in this case. It is well settled that actual damages under the Fair Credit Reporting Act include

15

damages for emotional distress, even if the plaintiff has suffered no out-of-pocket losses. See e.g., *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1332-33 (9th Cir. 1995) (holding that damages for emotional distress were available under the FCRA where the plaintiff suffered from sleeplessness, nervousness, frustration, and mental anguish as a result of the statutory violation); *Dennis v. BEH-1, LLC,* 504 F.3d 892, 895 (9th Cir. 2007) ("Actual damages" under the FCRA include damages for emotional distress.); *Fischl v. General Motors Acceptance Corp.,* 708 F.2d 143, 151 (5th Cir. 1983); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 369 fn. 15 (5th Cir. 2001), cert. denied, 151 L. Ed. 2d 261, 122 S. Ct. 346 (2001).

A plaintiff's testimony that she suffered emotional distress is sufficient to raise a jury question regarding whether the plaintiff suffered emotional distress; no "objective" evidence of mental anguish is necessary. *See Passantino v. Johnson & Johnson Cons. Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000); *Diaz v. Tesla, Inc.*, 598 F. Supp. 3d 809, 834 (N.D. Cal. 2022) ("[Emotional distress] damages can be established, among other ways, by a plaintiff's testimony about his harm and the testimony of others about that harm."); *Sunseri v. Experian Info. Sols., Inc.*, No. 2:20-CV-08932-DOC-RAOx, 2023 U.S. Dist. LEXIS 183984, at *13-14 (C.D. Cal. Oct. 11, 2023).

In Plaintiff's declaration opposing IQ's summary judgment motion, after providing the details of the ordeal IQ has put her through, she establishes her emotional distress damages. Summarizing the points in her declaration regarding emotional distress, they include: enormous and ongoing agitation, anxiety, stress, and frustration from the relentless harassment, described as a "nightmare that never ends"; disruption of her wedding planning, with a concern for her fiancé's possible loss of trust in her regarding being financially responsible, feeling unfairly accused and disheartened, and the futility of dealing with IQ; learning in September 2022 of the IQ collection derogatory on her credit profile, her nightmare returned with a vengeance,

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

escalating her anxiety, coupled with IQ's hounding her and at the same time ignoring her attempts to get validation of the alleged debt.

The Hesselbrocks tried renting a home after moving in 2023. The rental application asked if they could expect any red flags on their credit reports, and Plaintiff was quite embarrassed and ashamed to have to admit that there was a collection item on her credit, that of IQ. The Hesselbrocks never heard back on the rental application, strongly suspecting that IQ derogatory was the reason. They then tried purchasing a home, using only her husband's credit for the mortgage application. Plaintiff found it embarrassing and disheartening to have to have a collection item on her credit report, seen as a reflection of her financial reputation. The ramifications have been far-reaching, harmful, embarrassing, and extremely stressful for Plaintiff.

Plaintiff spent many hours distracted and unfocused from her full-time job, and away from spending quality time with her family. IQ has caused her severe headaches, sleepless nights, worry and anxiety. It felt to her like an endless tearing-down of her reputation.

Plaintiff's husband, Erich Hesselbrock, also submitted a declaration regarding his wife's mental anguish in opposition to defendant's summary judgment motion. He provides the background of the ordeal and confirms that Plaintiff suffered "unnecessary stress, anxiety, loss of appetite, headaches where she took medication to alleviate symptoms, loss of family time" and other problems.

### 2. Plaintiff's Other Damages.

Plaintiff's expert witness, Thomas Tarter, provides support not only for Plaintiff's emotional distress damages but also other damages for false credit reporting and wrongful debt collection practices. Mr. Tarter concludes that IQ damaged and harmed Plaintiff economically and non-economically.

Mr. Tarter explains that under industry standards, IQ's conduct was not "your ordinary garden-variety debt collector and consumer debt dispute," noting the loss of quality of life that can result. Mr. Tarter notes the impact of accounts reported as

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

unpaid to consumers like Plaintiff, resulting in economic and non-economic damages. After establishing that IQ's investigation did not meet industry standards and was not commercially reasonable, and that IQ's credit reporting was not accurate, he establishes Plaintiff's damages, including: false credit reporting damages; time, energy and money needed to remedy negative credit information; credit stigma; "chilling" effect, i.e., avoiding seeking credit for purchases.  Mr. Tarter provides a long list of the categories of damages that Plaintiff suffered. He concludes that IQ caused Plaintiff both economic and non-economic damages.

**3. IQ's Conduct was Willful, Amply Justifying an Assessment of Punitive Damages.**

Conduct is willful under FCRA if defendant acted recklessly with respect to the rights of plaintiff. A furnisher's conduct is "reckless" if its conduct constituted an unjustifiably high risk of harm that is either known or so obvious that it should be known. 15 U.S.C. Section 1681n; Safeco Ins. Co. of America v. Burr (2007) 75 USLW 4386, 127 S.Ct. 2201, 2208-2210, 167 L.Ed.2d 1045.

Here, there are multiple instances of reckless conduct:

1. Waiting to validate the debt for a year;

2. Commencing negative credit reporting before receiving any validation of the alleged debt;

3. Negative credit reporting even though the information received from the landlord was conflicting--$81.54 in the Statement of Security Deposit vs. $0 in the Ledger.

18

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

4. Not investigating whether Ms. Hesselbrock's alleged debt was canceled because of the circumstances of her move-out—she was the victim of a crime on the premises.

5. Not contacting the key people with whom Ms. Hesselbrock dealt when she confirmed her $0.00 balance, particularly Ruth Cook.

6. Not conducting any investigation whatsoever of the online portal, which showed a $0.00 balance for Ms. Hesselbrock in both August and September of 2021.

7. Confining its reinvestigation to two email exchanges and nothing else, when an adequate investigation would have required at least inquiring into the online portal, clarifying the $0.00 balance on the ledger and speaking with the persons Ms. Hesselbrock dealt with when moving out of the apartment building.

Plaintiff has presented a compelling case for an assessment of punitive damages against IQ.

Respectfully submitted,

Dated: August 28, 2024    **LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**

By:   */s/ Robert F. Brennan*
Robert F. Brennan
Attorney for Plaintiff
MONIQUE HESSELBROCK

19

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Monique Hesselbrock, certifies that this brief contains 6,754, which complies with the word limit of L.R. 11-6.1.

Dated: August 28, 2024          **LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**


By:    */s/ Robert F. Brennan*
          Robert F. Brennan
          Attorney for Plaintiff
          MONIQUE HESSELBROCK

20

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW